UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

AARON MERRIMAN,                         :

                    Plaintiff,          :     14 Civ. 3510 (PGG)(HBP)

       -against-                        :     REPORT AND
                                              RECOMMENDATION
CAROLYN W. COLVIN, ACTING               :
COMMISSIONER OF SOCIAL SECURITY,
                                        :
                    Defendant.
                                        :
----------------------------------X

          PITMAN, United States Magistrate Judge:

          TO THE HONORABLE PAUL G. GARDEPHE, United States

District Judge,


I.   Introduction


          Plaintiff, Aaron Merriman, brings this action pursuant

to Section 205(g) of the Social Security Act (the "Act"), 42

U.S.C. § 405(g), seeking judicial review of a final decision of

the Commissioner of Social Security ("Commissioner") denying his

application for disability insurance benefits ("DIB").  Plaintiff

and the Commissioner have both moved for judgment on the plead-

ings pursuant to Rule 12(c) of the Federal Rules of Civil Proce-

dure (Docket Items 17 & 22).

          For the reasons set forth below, I respectfully recom-
mend that plaintiff's motion for judgment on the pleadings
(Docket Item 17) be granted to the extent of remanding this
matter for further proceedings pursuant to sentence four of 42
U.S.C. § 405(g) and that the Commissioner's cross-motion for
judgment on the pleadings (Docket Item 22) be denied.

II.  Facts

     A.  Procedural Background

          Plaintiff filed an application for DIB on June 30, 2011
claiming that he had been disabled since June 16, 2011 (Tr.[1] 171-
72).  The Social Security Administration denied plaintiff's
application, finding that he was not disabled (Tr. 117-23).
Plaintiff timely requested and was granted a hearing before an
Administrative Law Judge ("ALJ") (Tr. 128-35, 140-70).  ALJ
Michael J. Stacchini conducted a hearing on December 4, 2012 (Tr.
36-116).  In a decision dated January 11, 2013, the ALJ deter-
mined that plaintiff was not disabled within the meaning of the
Act from June 16, 2011 through the date of decision (Tr. 18-31).
The ALJ's decision became the Commissioner's final decision on

---

          [1]"Tr." refers to the administrative record that the
Commissioner filed, pursuant to 42 U.S.C. § 405(g) (see SSA
Administrative Record, dated June 27, 2014 (Docket Item 14)).

April 23, 2014 when the Appeals Council denied plaintiff's request for review (Tr. 1-6).  Plaintiff commenced this action seeking review of the Commissioner's decision on May 13, 2014 (Complaint, dated May 22, 2014 (Docket Item 2)).

> B.  Plaintiff's
>     Social Background

Plaintiff was born on January 15, 1962 (Tr. 171).  In a Disability Report dated September 15, 2011, plaintiff reported that he was a high school graduate with no specialized training (Tr. 211).  Plaintiff stated that, from 1987 until his alleged onset of disability, he worked as a counselor at a group home operated by the New York State Association for Retarded Children ("ARC"), assisting nine residential "clients" with disabilities (Tr. 211-12, 230, 256).  Plaintiff wrote that, as a counselor, he typically walked for three hours per day, sat for one hour per day, stood for three hours per day and climbed for one hour per day (Tr. 212).  He reported that his job did not require that he regularly lift or carry anything, and, at most, he was required to lift objects weighing less than ten pounds (Tr. 212).

Plaintiff wrote that he stopped working on June 16, 2011 because he suffered from depression, anxiety and phobias (Tr. 210).  Plaintiff's sister, Nikki Merriman, completed a

Function Report, dated October 7, 2011 (Tr. 222-30).  Ms. Merri-
man reported that plaintiff was fired from ARC on June 16, 2011
because he was unable to drive his clients to school and was
stressed (Tr. 229-30).

In a letter, dated December 1, 2012, Deborah Dilone,
plaintiff's manager at ARC from 2005 through 2011, stated that
she witnessed plaintiff having panic attacks on several occasions
which rendered him unable to complete his work, particularly
driving clients, cooking, cleaning and administering medications
(Tr. 256).  She observed that plaintiff became progressively more
anxious and experienced bouts of depression (Tr. 256).  She wrote
that plaintiff reported feeling nervous, shaking and having heart
palpitations (Tr. 256).  She also reported that plaintiff re-
ceived a warning after he made an error distributing medication
and that he was eventually terminated for excessive absences due
to his conditions (Tr. 256).

Ms. Merriman reported that plaintiff had a girlfriend,
lived with family and typically spent the day watching televi-
sion, seeing his therapist, staying in the backyard and talking
to his girlfriend (Tr. 222-23).  Plaintiff is divorced and has an
adult son (Tr. 314, 392).

Ms. Merriman reported that as a result of plaintiff's
mental conditions, he could no longer drive, go for walks, shop,

4

work or clean and was unable to sleep more than three to four hours a night because of panic attacks (Tr. 223). She noted that plaintiff was unable to "match clothes," sometimes put his clothing on backwards and needed assistance with yard work because he was unable to use his arms to push the lawnmower (Tr. 223, 225). Ms. Merriman stated that plaintiff was unable to pay bills or handle financial matters because he would forget how to handle money "due to [his] depression" (Tr. 226).

Ms. Merriman reported that plaintiff was unable to stray far from the house without having "serious panic attacks" unless he was accompanied by someone (Tr. 225-26, 228). Although plaintiff had a driver license, Ms. Merriman reported that plaintiff was unable to drive without having anxiety attacks (Tr. 226). Ms. Merriman wrote that plaintiff rarely spent time with others and that plaintiff usually made it to church only once per month without having an anxiety attack or bout of depression (Tr. 227). She wrote that plaintiff had difficulty getting along with his boss and others, and his only social activities were with his family (Tr. 227, 229).

Ms. Merriman reported that plaintiff had difficulty with his memory; he had to be reminded to take his medication, to bathe and to wipe himself after using the toilet and needed help shaving (Tr. 223-24). Ms. Merriman stated that plaintiff was not

5

allowed to cook or iron because he might forget to turn off the appliances he was using (Tr. 224-25).  She noted that plaintiff was able to feed himself but did not prepare meals (Tr. 224-25).  Ms. Merriman reported that plaintiff had difficulty paying attention and could not complete tasks without reminders but could follow oral and written instructions "somewhat" (Tr. 226-30).

      C.  Plaintiff's
          Medical Background[2]

          1.  Plaintiff's
             Physical Condition

              a.  Information
                  Reported by the Plaintiff

In the September 15, 2011 Disability Report, plaintiff reported no physical conditions or pain that limited his ability to work (Tr. 210).  However, in October 2011, Ms. Merriman wrote that plaintiff had tennis elbow in both of his elbows, had undergone surgery on his left elbow and had arthritis (Tr. 227).  She stated that, among other things, plaintiff could sit all day and reach but was unable to lift objects due to his elbows (Tr.

_____

[2]I recite only those facts relevant to my review.  The administrative record (Docket Item 14) more fully sets out plaintiff's medical history.

6

227-29).  A second Disability Report, dated January 10, 2012, substantially repeated the foregoing (Tr. 233).

> b.  Dr. Fond --
> Treatment Records

Plaintiff was treated by Dr. Jason Fond, an orthopedic surgeon, for elbow pain (Tr. 399-414).  Plaintiff first saw Dr. Fond on December 9, 2010, complaining of significant, radiating pain in his left elbow (Tr. 399).  Dr. Fond diagnosed him with left elbow lateral epicondylitis[3] and injected his elbow with a lidocaine and cortisone solution (Tr. 399).

After beginning physical therapy and wearing a brace, plaintiff reported on February 3, 2011 that the injection helped for a while but that he was in significant pain again (Tr. 414). On February 25, 2011, Dr. Fond performed surgery on plaintiff's left elbow, excising a portion of the carpi radialis tendon,[4]

---

[3]Lateral epicondylitis, or tennis elbow, "is an inflammation of the tendons that join the forearm muscles on the outside of the elbow" and is "caused by overuse."  "Tennis Elbow (Lateral Epicondylitis)," OrthoInfo, Am. Acad. of Orthopaedic Surgeons, http://orthoinfo.aaos.org/topic.cfm?topic=a00068 (last visited Aug. 6, 2015).

[4]The carpi radialis is a muscle that extends along the forearm that "helps stabilize the wrist when the elbow is straight."  "Tennis Elbow (Lateral Epicondylitis)," OrthoInfo, Am. Acad. of Orthopaedic Surgeons, http://orthoinfo.aaos.org/topic.cfm?topic=a00068 (last visited Aug. 6, 2015).

debriding the lateral epicondyle[5] and suturing a tear in the
common extensor tendon[6] (Tr. 406).  On February 28, 2011, Jeff
Lee, a physician's assistant, noted that the incision was healing
well with no visible abnormalities and the sutures were removed
on March 10, 2011 (Tr. 406, 412-13).  Plaintiff continued physi-
cal therapy (Tr. 412-13).

     On April 6, 2011, Dr. Fond noted that plaintiff had a
range of motion of 0 to 130 degrees, and plaintiff reported that
his elbow felt better overall, although he still had some discom-
fort (Tr. 411).  On May 4, 2011, plaintiff reported reaggravating
his left elbow and experiencing right elbow pain (Tr. 410).  Dr.
Fond noted some tenderness at the incision site but good range of
motion and no instability (Tr. 410).  On May 25, 2011, plaintiff
reported pain in both of his elbows (Tr. 409).  Dr. Fond noted
that both elbows had good range of motion and no instability with
some tenderness (Tr. 409).  He diagnosed plaintiff with right
elbow lateral epicondylitis and "left elbow status post common

---

[5]The lateral epicondyle is where the carpi radialis attaches
at the elbow.  "Tennis Elbow (Lateral Epicondylitis)," OrthoInfo,
Am. Acad. of Orthopaedic Surgeons, http://orthoinfo.aaos.org/
topic.cfm?topic=a00068 (last visited Aug. 6, 2015).

[6]The common extensor tendon attaches to the lateral
epicondyle and extends down the forearm, dividing and attaching
the bone to four muscles, including the carpi radialis.  "Tennis
Elbow (Lateral Epicondylitis)," OrthoInfo, Am. Acad. of
Orthopaedic Surgeons, http://orthoinfo.aaos.org/topic.cfm?
topic=a00068 (last visited Aug. 6, 2015).

extensor tendon debridement with continued pain" (Tr. 409).  He injected plaintiff's right elbow with lidocaine and cortisone solution (Tr. 409).

On June 8, 2011, plaintiff underwent an MRI of his left elbow which revealed "[f]indings consistent with tendinitis and partial tear of the common extensor tendon[,] . . . [s]mall joint effusion . . . [and m]ild degenerative changes of the capitellum with evidence of chondromalacia" (Tr. 401).  On June 20, 2011, plaintiff reported intermittent pain, and Dr. Fond wrote that he would see plaintiff as needed (Tr. 408).

       c.  <u>Medications</u>

The testimony and documents associated with plaintiff's application reflect that at various times plaintiff was prescribed, among other medications, the following pain relief or anti-inflammatory medications:  Nucynta (<u>see</u>, <u>e</u>.<u>g</u>., Tr. 258), hydrocodone-acetaminophen (<u>see</u>, <u>e</u>.<u>g</u>., Tr. 259), ibuprofen (<u>see</u>, <u>e</u>.<u>g</u>., Tr. 262), diclofenac (<u>see</u>, <u>e</u>.<u>g</u>., Tr. 261) and naprosyn (<u>see</u>, <u>e</u>.<u>g</u>., Tr. 410).

2.   Plaintiff's
     Mental Condition

     a.   Information
          Reported by the Plaintiff

In the September 15, 2011 Disability Report, plaintiff reported that he suffered from depression, anxiety and phobias (Tr. 210).  He stated that he was currently taking Cymbalta for depression, Klonopin or clonazepam for anxiety and panic attacks and hydrochlorothiazide for high blood pressure (Tr. 213, 235). Plaintiff noted that the medications made him feel dizzy and the Klonopin made him tired (Tr. 235).  In the Function Report, Ms. Merriman wrote that plaintiff sometimes heard voices (Tr. 228). In the January 10, 2012 Disability Report, plaintiff reported that his anxiety and depression were worsening and he continued to forget things related to his activities of daily living (Tr. 233, 235).

Beyond the treatment described below, plaintiff also reported that he (1) attended therapy sessions with Dr. Dong Choe from 2006 through 2008 for treatment of his anxiety and depres- sion;[7] (2) saw the late Dr. Harold Fogelman from February 2008

---

[7]Dr. Choe failed to respond to initial requests for records because he was on vacation (Tr. 45-46, 303).  At the hearing, plaintiff's counsel stated that it was unnecessary to obtain Dr.
(continued...)

through October 2010[8] and (3) saw Dr. Charles S. Astrove in 2010 for treatment for anxiety and depression[9] (Tr. 213-15, 236).

### b.   Treatment Records

#### i.   Good Samaritan Regional Medical Center

Plaintiff was admitted to Good Samaritan Regional Medical Center in Suffern, New York for observation on December 16, 2005 and was diagnosed with a near syncopal episode[10] and

---

[7](...continued)
Choe's records because the treatment dates were so remote from the alleged onset of disability (Tr. 45-46, 51).

[8]At the hearing, plaintiff's counsel reported that he was unable to obtain the records of Dr. Fogelman because he was deceased, and the location of his files was unknown; he also noted that the treatment ended well before the onset of disability (Tr. 41-42).

[9]Although plaintiff reported that Dr. Astrove treated him in 2010, by letter, dated December 3, 2012, Dr. Astrove wrote that he treated plaintiff with psychotherapy and medication from 2007 through 2008 for recurrent depressive disorder and panic disorder with no improvement in his condition (Tr. 213, 397).

[10]Syncopal episodes are "temporary suspension[s] of consciousness due to general cerebral ischemia." Dorland's Illustrated Medical Dictionary ("Dorland's") at 1628 (27th ed. 1988).  Plaintiff's episode was diagnosed as near syncopal because he did not lose consciousness or become disoriented (Tr. 286).

sinus tachycardia[11] (Tr. 286-87).  He was ordered to avoid cold medications (Tr. 286).  Plaintiff reported that he was also hospitalized at Good Samaritan in 2006 for four days (Tr. 216).

### ii.  Saint Clare's Hospital

Plaintiff also reported that he was hospitalized at Saint Clare's Hospital in Denville, New York "for a few days" for panic attacks (Tr. 217).  The hospital records from Saint Clare's indicate that on September 4, 2010 plaintiff was treated and released from the emergency room by Dr. Ana L. Arias (Tr. 289, 296-97).  Plaintiff's chief complaints were shortness of breath and shaking (Tr. 293).  Plaintiff was provided with information about physical reactions to anxiety and instructed to return to the hospital if his symptoms worsened (Tr. 294-97).

---

[11]Sinus tachycardia is an excessive heart rate.  Dorland's at 1659.

### iii.  Rockland County Department of Mental Health -- Summit Park Hospital -- Pomona Outpatient Clinic[12]

#### A.  Records Concerning Plaintiff's Condition Prior to the Alleged Onset of Disability

The first progress note regarding plaintiff's treatment at Rockland County Department of Mental Health's Pomona Outpatient Clinic at Summit Park Hospital ("RCDMH") is dated February 3, 2011 (Tr. 393).  It appears that plaintiff first saw Rick Demarse, a licensed clinical social worker, for therapy sessions on February 17, 2011 (Tr. 391).  During these first sessions, plaintiff reported episodes of panic, falling asleep at work and a four-year history of anxiety (Tr. 391-92).

Dr. Mark J. Bernstein, a psychiatrist, evaluated plaintiff on March 10, 2011 (Tr. 347-48).[13]  He noted that plaintiff had a lengthy history of anxiety and recurrent panic attacks

---

[12]The notes of the doctors and staff at the Rockland County Department of Mental Health are handwritten and largely illegible, particularly those of Dr. Mark J. Bernstein.  The legible portions of plaintiff's records are described herein.

[13]Plaintiff's counsel reported that, at the time of the hearing, Dr. Bernstein no longer worked at RCDMH (Tr. 42). Initial attempts to obtain additional records from RCDMH were unsuccessful (see Tr. 42-43); however, at the hearing, plaintiff's counsel stated that he believed the ALJ had all relevant records from RCDMH, including some pre-dating the alleged onset of disability, and stated that he believed there was no need to seek anything further from RCDMH (Tr. 42-46, 51).

13

and that plaintiff reported continued, frequent panic attacks, agoraphobia and "hearing voices" in the past (Tr. 347).  Dr. Bernstein noted that plaintiff was dressed appropriately; had good hygiene, intact concentration and fair insight; was coopera- tive and calm and made appropriate eye contact (Tr. 348).  He diagnosed plaintiff with a panic disorder and agoraphobia with a score of fifty-five on the Global Assessment of Functioning ("GAF") scale[14] and adjusted plaintiff's medication (Tr. 348).

On March 23, 2011, plaintiff denied any recent panic attacks (Tr. 390).  On April 7, 2011, plaintiff reported that during the previous week he had heard voices which quickly disappeared (Tr. 385).  Dr. Bernstein continued to see plaintiff and renew his prescriptions approximately every four weeks from

---

[14]"GAF rates overall psychological functioning on a scale of 0-100 that takes into account psychological, social, and occupational functioning." Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010), citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. rev. 2000) ("DSM-IV").  A GAF between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers." DSM-IV at 34.  While the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders no longer utilizes GAF scores, see Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013), DSM-IV was in use during the treatment period at issue here.  See Vazquez v. Comm'r of Soc. Sec., 14 Civ. 6900 (JCF), 2015 WL 4562978 at *3 n.14 (S.D.N.Y. July 21, 2015) (Francis, M.J.).

May 2011 through December 29, 2011 (Tr. 357, 362, 368, 371, 377, 381).

Plaintiff also continued his therapy sessions with Demarse.  Plaintiff reported inability to deal with his second job, poor sleep, lack of appetite and increased anxiety (Tr. 383-84).  Plaintiff reported that he was unable to drive, focus or function at his job and that he continued to miss work because of his condition (Tr. 375, 379).

                    B.  Records Concerning
                        Plaintiff's Condition After
                        the Alleged Onset of Disability

After his June 16, 2011 termination, plaintiff reported no anxiety attacks (Tr. 376).  He described the "stress of working" with the developmentally disabled population for twenty-four years and reported plans to marry his girlfriend (Tr. 364, 366, 373, 376).  However, he reported experiencing panic attacks again in September 2011 (Tr. 366, 370).

On October 19, 2011, plaintiff reported increased anxiety, waking in a panicked state, worsening agoraphobia and inconsistent hygiene, opining that his relationships were suffering because of his mental condition (Tr. 367).  On November 3, 2011, plaintiff stated that his depression was worse; he felt listless, heavy and apathetic; he was having difficulty driving

15

and he sometimes had difficulty talking (Tr. 363).  On November
23, 2011, plaintiff reported issues with panic, sleep and depres-
sion (Tr. 364).

On December 8, 2011, plaintiff stopped his therapy
sessions with Demarse (Tr. 361).  Plaintiff began seeing Dr. M.
Karimi-Pashaki, a psychiatrist, in 2012 for examinations and
renewal of his prescriptions (Tr. 356).  The records indicate
that from March 6, 2012 through November 1, 2012, plaintiff
reported intermittent panic attacks, and Dr. Karimi-Pashaki
adjusted his medication as needed (Tr. 352-56).

### iv.  Dr. Richard L. Kole

Plaintiff saw Dr. Richard L. Kole, an internist, for
his mental condition on October 19, 2011, after his alleged onset
of disability (Tr. 215-16, 305).  Plaintiff reported that he
could not concentrate, was depressed, could not work, ate "like a
pig" and slept only four hours per day (Tr. 305).  Dr. Kole noted
that plaintiff appeared depressed, but noted no problems with his
speech, perception or orientation (Tr. 309).  Dr. Kole wrote that
plaintiff exhibited reasonable insight and judgment, was capable
of performing calculations and had no limitations in his under-
standing, memory or social interactions (Tr. 309-10).  Dr. Kole
noted that he did not know if plaintiff had limitations in

16

sustaining concentration, persistence and adaptation and wrote
that he could not provide an opinion regarding plaintiff's work-
related abilities (Tr. 310-11).

### c.  Medications

The testimony and documents associated with plaintiff's
application reflect that at various times plaintiff was pre-
scribed the following medications to treat anxiety, panic,
depression and agoraphobia:  paroxetine or Paxil (see, e.g., Tr.
263), Zoloft (see, e.g., Tr. 271), Lexapro (see, e.g., Tr. 271),
Lamictal (see, e.g., Tr. 268), Trilofen (see, e.g., Tr. 353),
Klonopin (see, e.g., Tr. 213) and Cymbalta (see, e.g., Tr. 213).

### d.  Consultative Examinations

#### i.  Dr. Weinberger

Dr. Mark Weinberger, a pyschologist, examined plaintiff
on November 4, 2011 (Tr. 314-17).  Plaintiff reported that he was
driven to the evaluation by his friend (Tr. 314).  Dr. Weinberger
noted that plaintiff related adequately; was cooperative, appro-
priately dressed and well-groomed; maintained appropriate eye
contact; exhibited clear and fluent speech and coherent thought
processes and exercised good insight and judgment (Tr. 315-16).

Dr. Weinberger determined that plaintiff was goal-directed with
no evidence of current hallucinations, delusions or paranoia and
that his attention and concentration appeared intact (Tr. 315).
However, Dr. Weinberger noted that plaintiff had a depressed and
anxious affect; a dysthymic mood and impaired memory skills (Tr.
315-16).

Dr. Weinberger noted that plaintiff reported being able
to dress, bathe, groom himself, manage money and clean but that
he was not allowed to cook or do laundry (Tr. 316).  Plaintiff
reported that he was able to take public transportation if
accompanied (Tr. 316).  Plaintiff also reported good family
relationships (Tr. 316).

Dr. Weinberger diagnosed plaintiff with depressive
disorder, not otherwise specified and anxiety disorder, not
otherwise specified (Tr. 316).  He determined that plaintiff
could manage his own funds and that he could "follow and under-
stand simple directions, perform simple tasks independently,
maintain attention and concentration, maintain a regular sched-
ule, learn new tasks, perform complex tasks independently, make
appropriate decisions, relate adequately with others, and appro-
priately deal with stress" (Tr. 316-17).  He also wrote that
"[t]he results of the examination appear to be consistent with
psychiatric problems, but in and of itself, does not appear to

18

interfere with [plaintiff's] ability to function on a daily
basis" (Tr. 316).

### ii. Psychiatric Assessment

On December 2, 2011, Dr. M. Marks, a psychological
examiner, reviewed plaintiff's records and completed a Psychiat-
ric Review Technique form (Tr. 318-31).  Dr. Marks determined
that plaintiff did not satisfy the criteria of the impairments
listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "List-
ings"), particularly Listing 12.04 (affective disorders) and
Listing 12.06 (anxiety-related disorders) (Tr. 321, 323).  Dr.
Marks determined that plaintiff had moderate limitations in his
activities of daily living and moderate difficulties in maintain-
ing social functioning and maintaining concentration, persistence
and pace (Tr. 328).  Dr. Marks found no repeated episodes of
deterioration (Tr. 328).

Dr. Marks also completed a Mental Residual Functional
Capacity Assessment on December 2, 2011 after reviewing the
record and plaintiff's treatment history (Tr. 332-35).  He found
that plaintiff had moderate limitations in the ability to carry
out detailed instructions, maintain attention and concentration
for extended periods, perform scheduled activities, maintain
regular attendance, be punctual, work in coordination with or

proximity to others without distraction, complete a normal workday or workweek without interruption from his symptoms, perform at a consistent pace without unreasonable breaks, interact appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, respond appropriately to changes and set realistic goals or make plans independently (Tr. 332-33).

Based on these findings, Dr. Marks concluded that plaintiff was able to understand and remember simple and detailed instructions but may have difficulty relating with others and adapting to changes (Tr. 334).  Dr. Marks noted that plaintiff may benefit from "a low contact setting" (Tr. 334).  With regard to credibility, Dr. Marks also determined that plaintiff's claims were "partially consistent with the evidence in [the] file" (Tr. 334).

D.  Proceeding
    Before the ALJ

Plaintiff was represented by Herbert Forsmith, Esq. at the December 4, 2012 hearing (Tr. 36).  Plaintiff's attorney submitted a pre-hearing memorandum dated December 3, 2012 (Tr. 252-55).  At the hearing, plaintiff's counsel agreed to provide records from Dr. Fond within two weeks and stated his belief that

the record contained all relevant evidence needed to determine whether plaintiff was disabled under the Act (Tr. 45-51).

    1.  <u>Plaintiff's Testimony</u>

Plaintiff testified that he had experienced difficulties with anxiety since 2005 or 2006 and reported that his panic attacks had worsened over the years; however he could not remember whether he had been to the emergency room since his September 4, 2010 treatment at St. Clare's (Tr. 67-69, 73-74). Plaintiff testified that he suffered side effects from his medication, including impotence, dizziness, lightheadedness and possibly depression (Tr. 69). He stated his belief that his anxiety was triggered by his fear of driving and of being alone and that he was depressed because he was worried he was going to die (Tr. 69-70). Plaintiff also testified that his right arm required surgery because he was unable to lift it, it hurt and he could not straighten it (Tr. 71).

Plaintiff testified that he lived with his forty-nine year old sister and eighty year old mother, with whom he had a "fairly okay" relationship (Tr. 56, 61). He testified that before he broke up with his girlfriend in August 2012, they talked on the telephone and went out to eat at restaurants (although she always drove) (Tr. 57). Plaintiff reported that he

tried to help with cleaning the house but no longer cooked (Tr. 61-62, 67). He testified that his family told him that he had poor hygiene and that he needed to shower, shave and cut his hair (Tr. 85). He reported that he was not wearing clean clothes and did not shower before the hearing because he "didn't get a chance" (Tr. 86). The ALJ commented that plaintiff appeared clean, shaven and presentable (Tr. 86). Plaintiff reported that he talked with his friend Jose on the telephone and sometimes visited Jose's house (Tr. 66-67).

Plaintiff stated that he went shopping once every week or two as long as he was accompanied by someone (Tr. 62, 80-81). Although he was comfortable in his backyard, plaintiff testified that when he tried to leave his home alone he could travel for a block, at most, before he had to run back inside because of the "fear of a panic attack [or] anxiety attack" (Tr. 81, 83). The worst attacks consisted of heart palpitations and inability to concentrate or focus (Tr. 82).

Plaintiff testified that he had not driven in seven months because every time he drove he "would have like [a] panic attack or something"; however, he later testified that he had not driven since at least June 2011 (Tr. 62, 77-78, 80). Plaintiff testified that he took public transportation with Jose to the hearing (Tr. 64). He also stated that he took public transporta-

tion to doctors' appointments and was always accompanied by someone (Tr. 64-65).  Plaintiff also reported taking a train with a friend to Pennsylvania to visit a girl after August 2012 (Tr. 62-64).

Plaintiff testified that prior to the onset of his disability he worked as a counselor at a group home in Middletown, New York for two years assisting five clients (Tr. 58, 60, 76).  Plaintiff stated that he could do the job despite his elbow problems because the job required no lifting (Tr. 58-59). Plaintiff reported that he lost that job between March and May 2011 because the job was too far away and the lengthy drive caused panic attacks (Tr. 58-59).  However, plaintiff also testified that he never drove himself to Middletown; instead, someone would drive him to the job, he would stay there for three days and then someone would pick him up (Tr. 76).  He also stated that while driving was a significant part of his job, his supervisor did not make him drive (Tr. 77).  He stated that for several years his ARC supervisor, Dilone, accommodated his needs by not making him drive but that he was eventually terminated (Tr. 74-75).

2.  <u>Vocational Expert's Testimony</u>

Donald Slive, a vocational expert ("VE"), testified by telephone.  The ALJ posed four hypothetical individuals for the VE's consideration.  The ALJ first asked the VE to assume a person of plaintiff's

> age, education, and work experience, who doesn't have
> any exertional limitations, but will be limited to
> simple, routine, repetitive tasks; may require up to 5
> percent additional time off task in addition to regu-
> larly scheduled breaks; would require a low stress job,
> defined as having only occasional decision making, and
> occasional changes in the work setting; and would []
> require only superficial [contact], meaning he can be
> around the general public, but no direct interaction
> with the public, and only occasional interaction with
> coworkers, with no tandem tasks

(Tr. 92-93).  The VE testified that such an individual could perform the work of a packer, assembler-small products or sub-assembler (Tr. 93).  In his second hypothetical, the ALJ asked the VE to assume an individual with the same limitations as the first, who was also "limited to the full range of medium work, with only, with frequent reaching in all direction, but with the right hand only occasional above, [<u>sic</u>] overhead reaching" (Tr. 93-94).  The VE testified that such an individual could do the same three jobs (Tr. 94).  Next, the ALJ asked the VE to assume an individual with the same limitations as the second, who was also "limited to the full range of light work, with frequent

reaching in all directions, except for only occasional overhead reaching with the right hand" (Tr. 94).  The VE testified that such an individual could perform the work of an assembler-small products, a sub-assembler or a power screwdriver operator (Tr. 94).  Finally, the ALJ asked the VE to assume an individual with the same limitations as the second, "only instead of being off task 5 percent of the time, due to the impairments and the resulting symptoms from his anxiety and his depression, he's going to be off task for a minimum of 20 percent of the workday" (Tr. 95).  The VE testified that such an individual would be precluded from all work (Tr. 95).

The VE testified that the need to miss two days of work per month or to spend ten percent or more of time off task would preclude all work (Tr. 95, 99-100).  The jobs cited by the VE involved unskilled, minimally supervised, medium or light work and required following simple instructions (Tr. 93, 95, 99, 101, 104).  None of the jobs required driving or exposure to unpro-tected heights (Tr. 94-95).

III.  <u>Analysis</u>

    A.  Applicable
       <u>Legal Principles</u>

      1.  <u>Standard of Review</u>

      The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. § 405(g); <u>Selian v. Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013) (<u>per curiam</u>); <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008).

      The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence.  <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Johnson v. Bowen</u>, 817 F.2d 983, 985 (2d Cir. 1987). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision," <u>Ellington v. Astrue</u>, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (Marrero, D.J.); <u>accord</u> <u>Johnson v. Bowen</u>, <u>supra</u>, 817 F.2d at 986, but "where application of the correct legal principles to the record could lead to only one conclusion, there

26

is no need to require agency reconsideration." <u>Johnson v. Bowen</u>,
<u>supra</u>, 817 F.2d at 986.

"'Substantial evidence' is 'more than a mere scintilla.
It means such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion.'" <u>Talavera v. Astrue</u>,
<u>supra</u>, 697 F.3d at 151, <u>quoting</u> <u>Richardson v. Perales</u>, 402 U.S.
389, 401 (1971).  Consequently, "[e]ven where the administrative
record may also adequately support contrary findings on particu-
lar issues, the ALJ's factual findings 'must be given conclusive
effect' so long as they are supported by substantial evidence."
<u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (<u>per</u> <u>curiam</u>),
<u>quoting</u> <u>Schauer v. Schweiker</u>, 675 F.2d 55, 57 (2d Cir. 1982).
Thus, "[i]n determining whether the agency's findings were
supported by substantial evidence, 'the reviewing court is
required to examine the entire record, including contradictory
evidence and evidence from which conflicting inferences can be
drawn.'" <u>Selian v. Astrue</u>, <u>supra</u>, 708 F.3d at 417, <u>quoting</u>
<u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1038 (2d Cir. 1983) (<u>per</u>
<u>curiam</u>).

27

2.  Determination
    of Disability

A claimant is entitled to DIB if he can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to work must last twelve months).[15]  The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be "of such severity" that the claimant cannot perform his previous work and "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  Whether such work is actually available in the area where the claimant resides is immaterial.  42 U.S.C. § 423(d)(2)(A).

---

[15]The standards that must be met to receive Supplemental Security Income benefits under Title XVI of the Act are the same as the standards that must be met in order to receive DIB under Title II of the Act.  Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  Accordingly, cases addressing the former are equally applicable to cases involving the latter.

In making the disability determination, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotation marks and citation omitted); DiPalma v. Colvin, 951 F. Supp. 2d 555, 565 (S.D.N.Y. 2013) (Peck, M.J.).

The Commissioner must follow the five-step process required by the regulations. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The first step is a determination of whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If he is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii). If he does, the inquiry at the third step is whether any of these impairments meet one of the listings in Appendix 1 of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the answer to this inquiry is affirmative, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can

29

still perform his past relevant work given his RFC.  20 C.F.R.
§ 404.1520(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at
24-25.  If he cannot, then the fifth step requires assessment of
whether, given claimant's RFC, he can make an adjustment to other
work.  20 C.F.R. § 404.1520(a)(4)(v).  If he cannot, he will be
found disabled.  20 C.F.R. § 404.1520(a)(4)(v); see Selian v.
Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697
F.3d at 151.

RFC is defined in the applicable regulations as "the
most [the claimant] can still do despite [his] limitations."
20 C.F.R. § 404.1545(a)(1).  To determine RFC, the ALJ "identi-
f[ies] the individual's functional limitations or restrictions
and assess[es] his or her work-related abilities on a
function-by-function basis, including the functions in paragraphs
(b),(c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945."
Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per
curiam), quoting SSR 96-8p, 1996 WL 374184 at *1 (July 2, 1996).
The results of this assessment determine the claimant's ability
to perform the exertional demands of sustained work which may be
categorized as sedentary, light, medium, heavy or very heavy.[16]

---

[16]Exertional limitations are those which "affect
[plaintiff's] ability to meet the strength demands of jobs
(sitting, standing, walking, lifting, carrying, pushing, and
(continued...)

20 C.F.R. § 404.1567; see Rodriquez v. Apfel, 96 Civ. 8330 (JGK),
1998 WL 150981 at *7 n.7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).
This ability may then be found to be limited further by
nonexertional factors that restrict claimant's ability to work.[17]
See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended
in part on other grounds on reh'g, 416 F.3d 101 (2d Cir. 2005);
Bapp v. Bowen, 802 F.2d 601, 605-06 (2d Cir. 1986).

The claimant bears the initial burden of proving
disability with respect to the first four steps.  Selian v.
Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537
F.3d at 128.  Once the claimant has satisfied this burden, the
burden shifts to the Commissioner to prove the final step -- that
the claimant's RFC allows the claimant to perform some work other
than his past work.  Selian v. Astrue, supra, 708 F.3d at 418;
Butts v. Barnhart, supra, 388 F.3d at 383.

---

[16](...continued)
pulling)."  20 C.F.R. § 404.1569a(b).

[17]Nonexertional limitations are those which "affect only
[plaintiff's] ability to meet the demands of jobs other than the
strength demands," including difficulty functioning because of
nervousness, anxiety or depression, maintaining attention or
concentration, understanding or remembering detailed
instructions, seeing or hearing, tolerating dust or fumes, or
manipulative or postural functions, such as reaching, handling,
stooping, climbing, crawling or crouching.  20 C.F.R. §
404.1569a(c).

In some cases, the Commissioner can rely exclusively on the medical-vocational guidelines (the "Grids") contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step.  Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995).  "The Grid[s] take[] into account the claimant's RFC in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid[s] indicate[] whether the claimant can engage in any other substantial gainful work which exists in the national economy."  Gray v. Chater, supra, 903 F. Supp. at 298; Butts v. Barnhart, supra, 388 F.3d at 383.

Exclusive reliance on the Grids is not appropriate where nonexertional limitations "significantly diminish [a claimant's] ability to work."  Bapp v. Bowen, supra, 802 F.2d at 605-06; accord Butts v. Barnhart, supra, 388 F.3d at 383 (internal quotation omitted).  "'[S]ignficiantly diminish' . . . mean[s] the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity."  Bapp v. Bowen, supra, 802 F.2d at 606; accord Selian v. Astrue, supra, 708 F.3d at 421; Zabala v. Astrue, supra, 595 F.3d at 411.  When the ALJ finds that the nonexertional limitations significantly diminish a claimant's ability to

32

work, then the Commissioner must introduce the testimony of a
vocational expert or other similar evidence in order to prove
"that jobs exist in the economy which the claimant can obtain and
perform." Butts v. Barnhart, supra, 388 F.3d at 383-84 (internal
quotation marks and citations omitted); see 20 C.F.R.
§§ 404.1569a(d), Pt. 404, Subpt. P, App. 2, § 200.00(e); see also
Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an indi-
vidual's capabilities are not described accurately by a rule, the
regulations make clear that the individual's particular limita-
tions must be considered.").

### 3. Duty to Develop the Record

"It is the rule in [the Second] [C]ircuit that 'the
ALJ, unlike a judge in a trial, must [him]self affirmatively
develop the record' in light of 'the essentially non-adversarial
nature of a benefits proceeding.'" Pratts v. Chater, 94 F.3d 34,
37 (2d Cir. 1996), quoting Echevarria v. Sec'y of Health & Human
Servs., 685 F.2d 751, 755 (2d Cir. 1982).

> Because a hearing on disability benefits is a non-
> adversarial proceeding, the ALJ generally has an affir-
> mative obligation to develop the administrative record.
> Echevarria v. Secretary of Health & Human Servs., 685
> F.2d 751, 755 (2d Cir. 1982).  This duty exists even
> when [, as here,] the claimant is represented by coun-
> sel . . . .  The [Commissioner's] regulations describe
> this duty by stating that, "[b]efore we make a determi-
> nation that you are not disabled, we will develop your

> complete medical history . . . [and] will make every
> reasonable effort to help you get medical reports from
> your own medical sources when you give us permission to
> request the reports."  20 C.F.R. § 404.1512(d).

Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); accord Halloran

v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) ("We

have stated many times that the ALJ generally has an affirmative

obligation to develop the administrative record . . . ." (inter-

nal quotation marks omitted)); Shaw v. Chater, 221 F.3d 126, 131

(2d Cir. 2000) ("The ALJ has an obligation to develop the record

in light of the non-adversarial nature of the benefits proceed-

ings, regardless of whether the claimant is represented by

counsel."); Tejada v. Apfel, supra, 167 F.3d at 774 (same);

Randolph v. Colvin, 12 Civ. 8539 (LTS)(JLC), 2014 WL 2938184 at

*8 (S.D.N.Y. June 30, 2014) (Cott, M.J.) (Report & Recommenda-

tion) (same); Van Dien v. Barnhart, 04 Civ. 7259 (PKC), 2006 WL

785281 at *14 (S.D.N.Y. Mar. 24, 2006) (Castel, D.J.) (same).

This duty takes on heightened significance when the

information concerns a claimant's treating physician.  Devora v.

Barnhart, 205 F. Supp. 2d 164, 172-73 (S.D.N.Y. May 22, 2002)

(Gorenstein, M.J.).

> [A]n ALJ cannot reject a treating physician's diagnosis
> without first attempting to fill any clear gaps in the
> administrative record.  See Schaal, 134 F.3d at 505
> ("[E]ven if the clinical findings were inadequate, it
> was the ALJ's duty to seek additional information from
> [the treating physician] sua sponte."); see also Hart-

> nett v. Apfel, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998)
> ("[I]f an ALJ perceives inconsistencies in a treating
> physician's reports, the ALJ bears an affirmative duty
> to seek out more information from the treating physi-
> cian and to develop the administrative record accord-
> ingly.").

Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999); accord Butts v.

Barnhart, supra, 388 F.3d at 386; Rivera v. Comm'r of Soc. Sec.,

728 F. Supp. 2d 297, 322 (S.D.N.Y. 2010) (Sullivan, D.J.) (adopt-

ing Report & Recommendation).  This is reflected in the applica-

ble regulations, which require the ALJ to "make every reasonable

effort to help [a claimant] get medical reports from [his] own

medical sources."  20 C.F.R. § 404.1512(d).[18]

---

[18]The relevant regulations were amended effective March 26,
2012, and the amendments are applicable here.  Lowry v. Astrue,
474 F. App'x 801, 804 n.2 (2d Cir. 2012); see How We Collect and
Consider Evidence of Disability, 77 Fed. Reg. 10651, 10651 (Feb.
23, 2012) (codified at 20 C.F.R. pts. 404, 416).  "[T]he current
amended regulations . . . give an ALJ more discretion to
'determine the best way to resolve the inconsistency or
insufficiency' based on the facts of the case," Rolon v. Comm'r
of Soc. Sec., 994 F. Supp. 2d 496, 505 (S.D.N.Y. 2014) (Nathan,
D.J.), quoting 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1)
(2013), but the amendments do "not, however, 'alter an
adjudicator's obligations.'"  Cabassa v. Astrue, 11 Civ. 1449
(KAM), 2012 WL 2202951 at *10 n.13 (E.D.N.Y. June 13, 2012),
quoting How We Collect and Consider Evidence of Disability,
supra, 77 Fed. Reg. at 10,652; accord Rolon v. Comm'r of Soc.
Sec., supra, 994 F. Supp. 2d at 505 n.2.  Furthermore, "the
regulations still contemplate the ALJ recontacting treating
physicians when 'the additional information needed is directly
related to that source's medical opinion.'"  Jimenez v. Astrue,
12 Civ. 3477 (GWG), 2013 WL 4400533 at *11 (S.D.N.Y. Aug. 14,
2013) (Gorenstein, M.J.), quoting How We Collect and Consider
Evidence of Disability, supra, 77 Fed. Reg. at 10,652.

However, "[a]lthough the Social Security regulations express a clear preference for evidence from the claimant's own treating physicians over the opinion rendered by a consultative examiner . . . [the Second Circuit] does not always treat the absence of a medical source statement from claimant's treating physicians as fatal to the ALJ's determination." Swiantek v. Comm'r of Soc. Sec., 588 F. App'x 82, 84 (2d Cir. 2015) (summary order), citing Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 33-34 (2d Cir. 2013) (summary order). "[R]emand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity. Tankisi v. Comm'r of Soc. Sec., supra, 521 F. App'x at 34. "In light of the SSA's regulations as distilled by the Second Circuit in Tankisi, the central question here is whether, '[g]iven the specific facts of this case,' the administrative record before the ALJ as to [plaintiff] . . . was sufficiently comprehensive 'to permit an informed finding by the ALJ.'" Sanchez v. Colvin, 13 Civ. 6303 (PAE), 2015 WL 736102 at *6 (S.D.N.Y. Feb. 20, 2015) (Engelmayer, D.J.) (adopting Report and Recommendation), quoting Tankisi v. Comm'r of Soc. Sec., supra, 521 F. App'x at 33-34. Where the ALJ has failed to develop the record adequately, remand to the Commissioner for further devel-

opment is appropriate.  See Pratts v. Chater, supra, 94 F.3d at
39.

### 4.  The Treating Physician Rule

Under the treating physician rule, a treating physi-
cian's opinion will be given controlling weight under certain
circumstances and, if not given controlling weight, must be
assessed pursuant to a multi-factor test to determine what weight
will be accorded to the opinion.  These factors include: (1) the
length of the treatment relationship and the frequency of exami-
nation, (2) the nature and extent of the treatment relationship,
(3) the medical support for the treating physician's opinion, (4)
the consistency of the opinion with the record as a whole, (5)
the physician's level of specialization in the area and (6) other
factors that tend to support or contradict the opinion.  20
C.F.R. § 404.1527(c)(2)-(6); Schisler v. Sullivan, 3 F.3d 563,
567 (2d Cir. 1993); Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009
WL 3096717 at *16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.)
(adopting Report & Recommendation of Freeman, M.J.); Matovic v.
Chater, 94 Civ. 2296 (LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan.
12, 1996) (McKenna, D.J.).

"[G]ood reasons" must be given for declining to afford
a treating physician's opinion controlling weight.  20 C.F.R.

37

§ 404.1527(c)(2); Schisler v. Sullivan, supra, 3 F.3d at 568;
Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *6 n. 3
(S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).  The Second Circuit has
noted that it "'do[es] not hesitate to remand when the Commis-
sioner has not provided "good reasons" for the weight given to a
treating physician[']s opinion.'"  Morgan v. Colvin, 592 F. App'x
49, 50 (2d Cir. 2015) (summary order), quoting Halloran v.
Barnhart, 362 F.3d 28, 32-33 (2d Cir. 2004) (per curiam).

B.   The ALJ's Decision

          As an initial matter, the ALJ found that plaintiff met
the insured status requirements of the Act through December 31,
2015 (Tr. 23).  At step one, the ALJ found that plaintiff had not
engaged in substantial gainful activity since June 16, 2011 (Tr.
23).  At step two, the ALJ found that plaintiff had severe
impairments, including "depression, anxiety, a panic disorder
with agoraphobia, right elbow epicondylitis, [and] status post
common extensor tendon debridement of the left elbow with contin-
ued pain" (Tr. 23).  At step three, the ALJ found that plaintiff
did not meet any of the listed impairments in 20 C.F.R. Part 404,
Subpart P, Appendix 1 (Tr. 23).

At step four, the ALJ found that plaintiff had the RFC "to perform less than the full range of medium work,"[19] with the following limitations:

> He can frequently reach in all directions, except he can only perform occasional overhead reaching.  He must avoid exposure to unprotected heights and driving a motor vehicle.  He must be permitted to be off tasks 5% of the time in addition to regularly scheduled breaks. He is also limited to the performance of simple, routine repetitive work in a low stress job defined as having only occasional decision making, occasional changes in the work setting with only occasional interaction with co-workers and no tandem tasks, and although he can be physically around the public, he is precluded from having work-related interaction with the public

(Tr. 25).

The ALJ gave "significant weight" to the opinion of Dr. Fond, a treating physician; "some weight" to the opinion of Dr. Kole, a treating physician and "great weight" to the consulting opinions of Dr. Weinberger and Dr. Marks; the ALJ did not state what weight he accorded plaintiff's treating psychiatrists, Dr.

--------

[19]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, . . . he or she can also do sedentary and light work."  20 C.F.R. § 404.1567(c). Light work includes jobs that require "a good deal of walking or standing, or when it involves sitting most of the time some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).  Sedentary work typically involves sitting with occasional walking and standing.  20 C.F.R. § 404.1567(a).

Bernstein and Dr. Karimi-Pashaki (Tr. 27-30).  The ALJ also gave "some weight" to the statements made in Dilone's letter (Tr. 28).

When assessing plaintiff's credibility, the ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of [his alleged] symptoms [were] not entirely credible" (Tr. 26).  The ALJ further concluded that "claimant's allegations of his inability to work on a continued, sustained basis as a result of his functional limitations [were] not credible" because "[t]he objective documentary medical evidence of record and claimant[']s testimony regarding his ability to function demonstrate[] the claimant retain[ed] the residual functional capacity" described above (Tr. 26-30).

The ALJ found that plaintiff had past relevant work as a group home counselor and that he could no longer perform that work because the exertional and nonexertional requirements exceeded his RFC (Tr. 30).

At step five, based on expert testimony and plaintiff's RFC, age, education and work experience, as well as the transferable skills plaintiff acquired from past relevant work, the ALJ concluded there were several jobs that existed in significant numbers in the national and regional economy that plaintiff could perform (Tr. 30-31).  The VE testified that a person with plaintiff's age, education, past relevant work experience, and RFC

could work as a packer, assembler/small parts, sub assembler or
power screwdriver operator, all of which existed in significant
numbers in the national and regional economy and which would
require no additional skills beyond those acquired by plaintiff
in his past relevant work (Tr. 30-31).  The ALJ determined that
the VE's testimony was consistent with the Dictionary of Occupa-
tional Titles (Tr. 31, citing SSR 00-4p).

        Accordingly, the ALJ found that plaintiff was not
disabled (Tr. 31).

        C.   Analysis of the
             ALJ's Decision

        Plaintiff appears to argue that the ALJ committed legal
error because he (1) failed to develop the record adequately, (2)
failed to apply the treating physician rule properly, (3) failed
to assess plaintiff's credibility properly and (4) in making his
RFC determination, improperly relied upon plaintiff's GAF score,
failed to consider evidence in Dilone's letter and failed to
provide a function-by-function analysis (Plaintiff's Motion for
Judgement [sic] on the Pleadings with Supporting Memorandum of
Law, dated December 12, 2014, (Docket Item 18) ("Pl. Mem."), 5-
10).  Plaintiff also argues that the ALJ committed legal error at
step five by (1) excluding various symptoms and limitations in

41

the hypotheticals posed to the VE and (2) failing to clarify which transferrable skills the VE considered (Pl. Mem. at 6). Finally, plaintiff argues that the ALJ's determination was not supported by substantial evidence (Pl. Mem. at 11).  The Commissioner contends that the ALJ's decision should be upheld because it was made pursuant to the correct legal standards and is based on substantial evidence (Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, dated January 12, 2015, (Docket Item 23) ("Comm'r Mem.") at 1, 19-33).

       1.  <u>Legal Error</u>

          a.  Development of the Record and
              <u>Weighing of Opinion Evidence</u>

      First, with respect to the ALJ's consideration of the medical evidence, plaintiff argues that the ALJ erred in determining plaintiff's RFC because he (1) failed to develop the record adequately because he did not recontact the doctors to clarify the effect of plaintiff's exertional and nonexertional limitations on his ability to work and (2) failed to apply the treating physician rule properly because he did not assign weight

42

to opinion evidence and did not explain the rationale for the
weight afforded (Pl. Mem. at 10-11).

Plaintiff argues that remand is required because the
ALJ failed to satisfy his duty to develop the record when he

> failed[] to obtain updated and[] detailed medical data
> and opinion[s] from the treating and other doctors
> regarding the Plaintiff's ability to perform relevant
> work-related functions, and failed to re-contact these
> doctors, to clarify the record regarding the nature and
> work-related effects of each impairment, and how such
> impairments in combination were believed, in light of
> the probative evidence, to permit the performance of
> the functions required of medium or other work

(Pl. Mem. at 10).  In addition, plaintiff argues that after
plaintiff testified to certain functional limitations, the ALJ
"failed to fully inquire of the treating doctors, as to whether,
in light of what they know of the Plaintiff[] and his impairment-
associated limitations, such limited functioning had been ob-
served or could be expected[] during the relevant period, and
why" (Pl. Mem. at 11).  Plaintiff also contends that the ALJ
erred in failing to take the testimony of plaintiff's friend,
Jose, at the hearing (Pl. Mem. at 8; Reply to the Commissioner's
Cross-Motion for Judgement [sic] on the Pleadings, dated January
26, 2015, (Docket Item 25) ("Pl. Reply") at 2).  Finally, plain-
tiff argues that the ALJ misapplied the treating physician rule
because he "was required to, but did not, provide, pursuant to
Social Security Regulation 20 [C.F.R. § ] 404.1527(d), a detailed

43

rationale spelling out the reasons for the weight assigned to each report" (Pl. Mem. at 10).

The Commissioner does not address whether the ALJ adequately developed the record, except to note that at the hearing, plaintiff's counsel (1) stated his belief that plaintiff's elbow problems did not prevent him from working, (2) was given the opportunity to produce additional records from Dr. Fond and (3) represented that he believed additional records from RCDMH were unnecessary (Comm'r Mem. at 2, 4, 30). However, the Commissioner does argue that the ALJ explicitly accorded "significant weight" to Dr. Fond's opinion, "great weight" to the opinions of Dr. Weinberger and Dr. Marks and "some weight" to Dr. Kole's opinion and explained the reasons for the weight assigned (Comm'r Mem. at 25-27).

### i.  Dr. Fond

The ALJ does not cite any functional assessments in support of his finding that plaintiff retained the RFC to perform medium work.  The only medical evidence in the record cited by the ALJ in support of his physical RFC determination is Dr. Fond's treatment notes (Tr. 29-30, 398-414).  Treatment notes, however, are not ordinarily a substitute for a treating physician's opinion, see Peed v. Sullivan, 778 F. Supp. 1241, 1246

(E.D.N.Y. 1991), and Dr. Fond's treatment notes do not address plaintiff's exertional and nonexertional limitations beyond a notation on April 6, 2011 that plaintiff should "[a]void any heavy lifting" (Tr. 411).  The ALJ did note that plaintiff's claims regarding the limiting effects of his physical condition, particularly his allegations of pain, appear inconsistent, at least in part, because plaintiff reportedly worked with the same elbow pain for years as a counselor, a job at the medium exertional level (Tr. 29-30).  However, Ms. Merriman reported and plaintiff testified that his job did not require lifting and that he was unable to lift because of his elbow pain, particularly with his right elbow, which needed surgery (Tr. 71, 212, 227-29).  In addition, while the ALJ considered plaintiff's claims with respect to his ability to reach in his RFC determination, the ALJ does not appear to discuss plaintiff's alleged limitations in pushing (see Tr. 225).

"Because an RFC determination is a medical determina-tion, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error."  Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010), citing Woodford v. Apfel, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) (Carter, D.J.) and Zorilla v. Chater,

915 F. Supp. 662, 666-67 (S.D.N.Y. 1996) (Koeltl, D.J.); <u>see also</u> <u>La Torre v. Colvin</u>, 14 Civ. 3615 (AJP), 2015 WL 321881 at *12 (S.D.N.Y. Jan. 26, 2015) (Peck, M.J.); <u>Legall v. Colvin</u>, 13 Civ. 1426 (VB), 2014 WL 4494753 at *4 (S.D.N.Y. Sept. 10, 2014) (Briccetti, D.J.) (adopting Report & Recommendation of Smith, M.J.); <u>Armstrong v. Colvin</u>, 12 Civ. 8126 (VB), 2013 WL 6246491 at *18 (S.D.N.Y. Dec. 3, 2013) (Briccetti, D.J.) (adopting Report & Recommendation of Davison, M.J.) (collecting cases).  Dr. Fond's single notation that plaintiff should avoid heavy lifting and notations that plaintiff's pain appeared to improve after surgery, alone, are insufficient to allow the ALJ's conclusion that plaintiff could perform medium work.

In addition, although the Commissioner appears to argue that the record was sufficient because plaintiff's counsel stated that he did not believe plaintiff's tennis elbow prevented him from working and the ALJ left the record open for two weeks, directing plaintiff's counsel to submit any additional records from Dr. Fond (<u>see</u> Comm'r Mem. at 2, 30; Tr. 47-52), that does not relieve the ALJ of his duty to develop the record.  The ALJ must "affirmatively develop the record . . . even where, as here, the claimant is represented by counsel." <u>Pratts v. Chater</u>, <u>supra</u>, 94 F.3d at 37 (internal quotation marks and citation omitted).  Here, the ALJ acknowledges a gap in the record with

46

respect to whether plaintiff's physical condition effects his
ability to work.  At the hearing, the ALJ instructed plaintiff's
counsel to obtain additional records from Dr. Fond, stating,

> I would like to have the medical records if [plaintiff
> is] claiming [his physical condition] still affects his
> ability to work . . . .  [L]ooking at the activities of
> daily living he was claiming he couldn't do almost
> anything with the arms.  I'd like to see . . . where it
> is.  I don't feel comfortable just ignoring it

(Tr. 50-51).  Although plaintiff's counsel submitted the records
from Dr. Fond after the hearing (Tr. 398-414), they did not
contain an assessment of plaintiff's functional limitations and
it does not appear that the ALJ attempted to obtain a medical
opinion from Dr. Fond regarding plaintiff's limitations or sought
the opinion of a consultative examiner to fill that gap.  See
Legall v. Colvin, supra, 2014 WL 4494753 at *5 (concluding ALJ's
duty to develop was not satisfied where no opinion was provided
regarding functional limitations, plaintiff's counsel failed to
provide an RFC assessment despite a request from the ALJ and the
ALJ did not seek one himself).

        The ALJ, thus, failed in his duty to develop the record
fully and the absence of a medical opinion with regard to plain-
tiff's physical RFC requires remand here.  See Rosa v. Callahan,
supra, 168 F.3d at 79-80; Elliot v. Colvin, 13 Civ. 2673 (MKB),
2014 WL 4793452 at *17 (E.D.N.Y. Sept. 4, 2014) (collecting

cases); see also Lacava v. Astrue, 11 Civ. 7727 (WHP)(SN), 2012
WL 6621731 at *16-*17 (S.D.N.Y. Nov. 27, 2012) (Netburn, M.J.)
(Report and Recommendation), adopted, 2012 WL 6621722 (S.D.N.Y.
Dec. 19, 2012) (Pauley, D.J.).  In addition, I note that the ALJ
afforded "significant weight," not controlling weight, to Dr.
Fond's treatment notes because "they document claimant's history
of . . . physical impairment[] and improvement of the claimant's
pain following treatment" (Tr. 29).  The ALJ failed to identify
fully which factors warranted affording Dr. Fond's opinion less
than controlling weight, and should the ALJ still accord Dr.
Fond's opinion less than controlling weight after further devel-
opment of the record, he should state his reasons for doing so
pursuant to 20 C.F.R. § 404.1527(c).

                    ii.  Dr. Kole

          Dr. Kole's opinion appears to be based upon a single
evaluation conducted during his initial examination of the
plaintiff on October 19, 2011, more than a year prior to the
hearing (Tr. 305).  Although Dr. Kole did assess plaintiff's
appearance and mental status (Tr. 307-10), he wrote that plain-
tiff's ability to sustain concentration and persistence, to adapt
and to function in the workplace was unknown; that he was unable
to opine on plaintiff's ability to work and that plaintiff needed

                              48

a psychiatric evaluation (Tr. 308, 310-11).  The ALJ afforded Dr. Kole's opinion only "some weight," because "the record clearly shows the claimant has some mental limitations, which Dr. Kole did not provide an opinion with respect to" (Tr. 27).

"The duty to develop the record is particularly important where an applicant alleges he is suffering from a mental illness[], due to the difficulty in determining 'whether these individuals will be able to adapt to the demands or "stress" of the workplace.'"  Hidalgo v. Colvin, 12 Civ. 9009 (LTS)(SN), 2014 WL 2884018 at *4 (S.D.N.Y. June 25, 2014) (Swain, D.J.) (adopting Report & Recommendation of Netburn, M.J.), quoting Lacava v. Astrue, supra, 2012 Wl 6621731 at *12.  If the ALJ was dissatisfied with Dr. Kole's failure to provide a medical opinion after his single examination of the plaintiff because of the gap created in the record, he had an affirmative duty to further develop the record with regard to plaintiff's limitations and their effect on plaintiff's ability to work before according Dr. Kole's opinion only some weight, particularly in light of the "great weight" afforded the consulting examiners' opinions (Tr. 28-29).  See Vazquez v. Comm'r of Soc. Sec., supra, 2015 WL 4562978 at *17 (collecting cases); Hidalgo v. Colvin, supra, 2014 WL 2884018 at *19 (same); see also 20 C.F.R. § 404.1512(e) ("We will not evaluate [consultative] evidence until we have made very

49

reasonable effort to obtain evidence from [plaintiff's] medical sources.").  The ALJ's failure to provide "good reasons" for affording Dr. Kole's opinion only some weight also warrants remand of this case.

Accordingly, I conclude that the ALJ's rejection of Dr. Kole's opinion, at least in part, without first attempting to clarify gaps in the record constituted legal error and grounds for remand.

### iii.   RCDMH - Dr. Bernstein and Dr. Karimi-Pashaki

In discussing and weighing the medical opinions in the record, the ALJ does not refer to Dr. Bernstein or Dr. Karimi-Pashaki by name; rather, he summarizes the RCDMH records, noting the findings of Dr. Bernstein's March 10, 2011 psychiatric evaluation and the follow-up reports of Dr. Bernstein, Dr. Karimi-Pashaki and Demarse (Tr. 28).  The RCDMH psychiatrists appear to be plaintiff's primary treating psychiatrists for his mental conditions; however, apparently because the psychiatrists provide no medical opinions with regard to the nature and sever-ity of plaintiff's limitations beyond a mere diagnosis and

description of symptoms,[20] the ALJ does not state the weight he accords the RCDMH records.

   The Commissioner suggests that plaintiff's counsel's statements during the hearing regarding the completeness of the record relieved the ALJ of his obligation to develop the record further (see Comm'r Mem. at 4).  At the hearing, plaintiff's counsel stated that "there [we]re other treatment records" from RCDMH that were not in the record; however, he also stated that all the RCDMH records covering the period of disability were in the record and that although the other records might be helpful in understanding "claimant's condition over time," plaintiff's

---

   [20]"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2) (emphasis added). Although Dr. Bernstein's evaluation included an assessment of plaintiff's appearance, social interaction and mental condition, it predated the alleged onset of disability, and was not, therefore, necessarily material to assessing plaintiff's RFC. See Carway v. Colvin, 13 Civ. 2431 (SAS), 2014 WL 1998238 at *5 (S.D.N.Y. May 14, 2014) (Scheindlin, D.J.) ("[M]edical evidence that predates the alleged disability onset date is ordinarily not relevant to evaluating a claimant's disability." (citing Briscoe v. Astrue, 892 F. Supp. 2d 567, 582 (S.D.N.Y. 2012) (Gorenstein, M.J.)).  In addition, in the assessment, Dr. Bernstein does not appear to explain what limitations, if any, plaintiff has as a result of his diagnosed panic disorder and agoraphobia or how those limitations affect his ability to work (see Tr. 347-48). The subsequent treatment notes and follow-up reports also fail to address plaintiff's exertional and nonexertional limitations and their affect on his ability to work (see Tr. 349-96).

counsel did not think it was necessary to obtain those records and was comfortable with the ALJ's decision not to seek those records (Tr. 42-44, 46, 51).

"The ALJ's responsibility to help a claimant obtain complete medical records dovetails with the treating physician rule . . . .  The combination of these two principles, 'compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability. . . .'" Oliveras ex rel. Gonzalez v. Astrue, 07 Civ. 2841 (RMB)(JCF), 2008 WL 2262618 at *6 (S.D.N.Y. May 30, 2008) (Francis, M.J.) (Report & Recommendation), adopted, 2008 WL 2540816 (S.D.N.Y. June 25, 2008) (Berman, D.J.).  While it does appear that plaintiff's counsel represented that the record was complete with respect to the records from RCDMH, because I am recommending that this case be remanded for further development of the record with regard to plaintiff's other treating physician (Dr. Kole) I need not decide whether the ALJ had a duty to recontact Dr. Bernstein and Dr. Karimi-Pashaki in the face of plaintiff's counsel's statement that the record was sufficiently developed.[21]  Never

---

[21]I note that in light of the ALJ's duty to develop the record regardless of whether the claimant is represented by counsel, particularly where there are gaps in the record, see Tejada v. Apfel, supra, 167 F.3d at 774 and Pratts v. Chater, supra, 94 F.3d at 37, at least some courts have determined that

(continued...)

theless, on remand, in light of the apparent lack of a complete medical opinion regarding plaintiff's mental limitations from either of plaintiff's treating psychiatrists, the ALJ should consider recontacting RCDMH to obtain an updated medical opinion with regard to plaintiff's limitations, weighing any opinions pursuant to the treating physician rule.

### iv.  Testimony of Jose

Finally, to the extent plaintiff contends that the ALJ erred by not taking the testimony of plaintiff's friend, Jose, denying him a full and fair hearing (Pl. Mem. at 8, Pl. Reply at 2), his argument is without merit.  At the hearing, in the middle of plaintiff's testimony, plaintiff's attorney alerted the ALJ that Jose was available to testify, but then continued, stating, "I don't see any purpose in it, but if your honor believes that he'd like collaboration [sic], or another further information [sic] on these activities then he's available to give testimony"

---

[21](...continued)
"where . . . it is apparent from the face of the record that the record lacks necessary information, the ALJ cannot be relieved of his affirmative obligation to develop the record by a statement of counsel [that the record is complete]."  Hilsdorf v. Comm'r of Soc. Sec., supra, 724 F. Supp. 2d at 346; see also Palascak v. Colvin, No. 1:11-CV-0592 (MAT), 2014 WL 1920510 at *11 (W.D.N.Y. May 14, 2014); Ubiles v. Astrue, 11-CV-6340T (MAT), 2012 WL 2572772 at *10 (W.D.N.Y. July 2, 2012).

(Tr. 64). The ALJ stated that, if plaintiff's counsel so chose, he could call Jose to testify after the plaintiff finished testifying (Tr. 64). Plaintiff's counsel did not seek to call Jose at any point thereafter, nor is there any evidence that he was precluded from doing so. Plaintiff had a full opportunity to present Jose's testimony and he did not take it; plaintiff cannot now complain that his own decision not to call Jose somehow denied him a full and fair hearing. Maurice v. Colvin, 12 Civ. 2114 (LGS)(FM), 2014 WL 2967442 at *15 (S.D.N.Y. July 2, 2014) (Maas, M.J.) (Report & Recommendation) ("To the extent that [he] failed to exercise that right, [he] cannot now complain that [he] was denied a full and fair hearing.), adopted, 2014 WL 5410004 (S.D.N.Y. Oct. 23, 2014) (Schofield, D.J.).

Moreover, although the Regulations allow the ALJ to consider evidence from "[o]ther non-medical sources," including friends like Jose, see 20 C.F.R. § 404.1513(d)(4), "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa v. Callahan, supra, 168 F.3d at 79 n.5. Because the record fails to disclose and plaintiff does not identify any obvious gaps with respect to plaintiff's conditions which could have been filled by Jose's testimony, who

54

was a non-medical source, and there is no evidence that plaintiff
was denied the opportunity to offer Jose's testimony, the fact
that Jose did not testify at the hearing did not constitute legal
error.

### v.   Summary

For all the foregoing reasons, I respectfully recommend
that this case be remanded for further development of the record.
On remand, if the ALJ decides not to accord a treating physician
or psychiatrist's opinion controlling weight after recontacting
him, he should take care to detail his reasons therefor.[22]

### b.   Credibility Assessment

Plaintiff next argues that the ALJ erred in his assess-
ment of plaintiff's credibility because he failed to provide
"specific and persuasive reasons for the finding on credibility,

---

[22]To the extent the plaintiff argues that the ALJ should
have recontacted the consulting examiners to clarify their
opinions (Pl. Mem. at 10), if, after making "every reasonable
effort to obtain evidence from" plaintiff's treating sources, the
ALJ determines that he does not have a complete medical history,
the ALJ may wish to consider whether additional consultative
examinations are needed to determine plaintiff's disability
claim.  20 C.F.R. § 404.1512(e); see Kentile v. Colvin, No. 8:13-
CV-880 (MAD)(CFH), 2014 WL 3534905 at *16 (N.D.N.Y. July 17,
2014); Cruz v. Shalala, 94 Civ. 0929 (JSM), 1995 WL 441967 at *5
(S.D.N.Y. 1995) (Martin, D.J.).

supported by the evidence in the case record," and failed to be
"sufficiently specific" with respect to "the weight [he] gave to
the [plaintiff's] statements and the reasons for that weight"
(Pl. Mem. at 10, citing SSR 96-7p).  The Commissioner contends
that the ALJ discussed plaintiff's testimony "in the context of
the complete record," properly credited plaintiff's subjective
complaints in the RFC finding and noted various inconsistencies
regarding plaintiff's claim of complete disability (Tr. 28-30).

> When determining a claimant's RFC, the ALJ is required
> to take the claimant's reports of pain and other limi-
> tations into account, 20 C.F.R. § 416.929; see
> McLaughlin v. Sec'y of Health, Educ. & Welfare, 612
> F.2d 701, 704-05 (2d Cir. 1980), but is not required to
> accept the claimant's subjective complaints without
> question; he may exercise discretion in weighing the
> credibility of the claimant's testimony in light of the
> other evidence in the record.  Marcus v. Califano, 615
> F.2d 23, 27 (2d Cir. 1979).
>
> The regulations provide a two-step process for
> evaluating a claimant's assertions of pain and other
> limitations.  At the first step, the ALJ must decide
> whether the claimant suffers from a medically determi-
> nable impairment that could reasonably be expected to
> produce the symptoms alleged.  20 C.F.R. § 404.1529(b).
> That requirement stems from the fact that subjective
> assertions of pain alone cannot ground a finding of
> disability.  20 C.F.R. § 404.1529(a).  If the claimant
> does suffer from such an impairment, at the second
> step, the ALJ must consider "the extent to which [the
> claimant's] symptoms can reasonably be accepted as
> consistent with the objective medical evidence and
> other evidence" of record.  Id.  The ALJ must consider
> "[s]tatements [the claimant] or others make about [his]
> impairment(s), [his] restrictions, [his] daily activi-
> ties, [his] efforts to work, or any other relevant
> statements [he] make[s] to medical sources during the

56

course of examination or treatment, or to [the agency]
during interviews, on applications, in letters, and in
testimony in [its] administrative proceedings." 20
C.F.R. § 404.1512(b)(3); <u>see also</u> 20 C.F.R. §
404.1529(a); S.S.R. 96-7p.

<u>Genier v. Astrue</u>, <u>supra</u>, 606 F.3d at 49.

"It is within the discretion of the [Commissioner] to
evaluate the credibility of plaintiff's complaints and render an
independent judgment in light of the medical findings and other
evidence regarding the true extent of such symptomatology."
<u>Gernavage v. Shalala</u>, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995)
(Leisure, D.J.); <u>accord</u> <u>Mimms v. Heckler</u>, 750 F.2d 180, 186 (2d
Cir. 1984); <u>Evans v. Astrue</u>, 783 F. Supp. 2d 698, 710-11
(S.D.N.Y. 2011) (Gorenstein, M.J.); <u>see</u> <u>Aponte v. Sec'y, Dep't of
Health & Human Servs.</u>, 728 F.2d 588, 591 (2d Cir. 1984); <u>Carroll
v. Sec'y of Health & Human Servs.</u>, 705 F.2d 638, 642 (2d Cir.
1983) ("It is the function of the [Commissioner], not [the
reviewing courts], to resolve evidentiary conflicts and to
appraise the credibility of witnesses, including the claimant.").
"Accordingly, where the ALJ's decision to discredit a claimant's
subjective complaints is supported by substantial evidence, [the
Court] must defer to his findings." <u>Calabrese v. Astrue</u>, 358 F.
App'x 274, 277 (2d Cir. 2009) (summary order), <u>citing</u> <u>Aponte v.
Sec'y, Dep't of Health & Human Servs.</u>, <u>supra</u>, 728 F.2d at 591;

Gates v. Astrue, 338 F. App'x 46, 48 (2d Cir. 2009) (summary
order).

          In this case, the ALJ, applying the two-step process,
found at step two that plaintiff's "statements concerning the
intensity, persistence and limiting effects of these symptoms are
not entirely credible for the reasons explained in this decision"
and that plaintiff's "allegations of his inability to work on a
continued, sustained basis as a result of his functional limita-
tions are not credible" (Tr. 26).  The ALJ explained that plain-
tiff's statements were inconsistent with each other, as well as
with his daily activities, his lack of emergency room visits and
hospitalizations, his work history, his appearance and hygiene at
the hearing and the opinions and findings of the treating and
consultative physicians, psychiatrists and examiners (Tr. 26-30).

          I conclude that the ALJ's credibility determination was
reached using the correct legal standards.  Consistent with the
regulations, the ALJ applied the two-step credibility framework,
and, at step two evaluated whether plaintiff's testimony was
consistent with the objective medical findings and factors set
forth in 20 C.F.R. § 404.1529(c).  In addition, the ALJ's deci-
sion provided specific reasons for discrediting plaintiff's
testimony and cited evidence which the ALJ perceived to be
inconsistent with plaintiff's testimony (Tr. 26-30).

However, to the extent that the ALJ relied on the absence of objective medical evidence or incomplete portions of the record, his analysis is flawed.  As discussed above, the ALJ failed to develop the record adequately and reliance on an incomplete record surely skewed his view of whether the medical record lent support to, was consistent with or contradicted plaintiff's testimony.  Given the mix of reasons the ALJ gave for discrediting plaintiff's statements about his symptoms, I cannot make a determination as to whether the ALJ's credibility determination is supported by substantial evidence based on the current record.  See Rosa v. Callahan, supra, 168 F.3d at 82 n.7 ("Because we have concluded that the ALJ was incorrect in [his] assessment of the medical evidence, we cannot accept [his] conclusion regarding [plaintiff's] credibility."); accord Montilla v. Comm'r of Soc. Sec., 13 Civ. 7012 (LTS)(MHD), 2015 WL 4460958 at *20-*22 (S.D.N.Y. July 21, 2015) (Swain, D.J.) (adopting Report & Recommendation of Dolinger, M.J.) ("While the ALJ has supported his credibility findings with sufficient detail and attention to the factors specified in the regulations and case-law, it is nonetheless unacceptable because it is based on a record that has not been properly and fully developed."); Wilson v. Colvin, 14 Civ. 9207 (AJP), 2015 WL 3463113 at *18 n.34 (S.D.N.Y. June 2, 2015) (Peck, M.J.) ("Because of [the ALJ's]

legal error in failing to develop the record . . . , the Commis-
sioner necessarily will have to reassess both [plaintiff's] RFC
and credibility . . . ."); <u>Jackson v. Colvin</u>, 13 Civ. 5655
(AJN)(SN), 2014 WL 4695080 at *21 (S.D.N.Y. Sept. 3, 2014)
(Nathan, D.J.) (adopting Report & Recommendation of Netburn,
M.J.).

On remand, the ALJ should re-evaluate plaintiff's
testimony after taking steps to develop the record as directed.

c.  Remaining RFC-Related Arguments
<u>and the ALJ's Decision at Step Five</u>

Plaintiff also claims that the ALJ committed legal
error in making his RFC determination by (1) improperly relying
upon plaintiff's GAF score, (2) failing to consider evidence in
Dilone's letter and (3) failing to provide a function-by-function
analysis and that the ALJ erred at step five when questioning the
VE because he (1) excluded various symptoms and limitations from
the hypotheticals and (2) failed to clarify which transferrable
skills the VE considered.  Because I find that remand is proper
on the basis of the ALJ's failure to develop the record ade-
quately and failure to apply the treating physician rule prop-
erly, as well as the need to reassess plaintiff's credibility,
each of which is integral in determining the RFC, I do not reach

60

plaintiff's remaining arguments, because I am unable to meaning-
fully review the ALJ's RFC analysis and the VE testimony which
relied upon the RFC in light of the antecedent errors.  See
Meadors v. Astrue, 370 F. App'x 179, 185-86 (2d Cir. 2010)
(summary order); Patrick v. Colvin, No. 13-CV-2174 (SJF), 2015 WL
1469270 at *17 (E.D.N.Y. Mar. 30, 2015); Spear v. Astrue, No. 13-
CV-6017P, 2014 WL 4924015 at *20 (W.D.N.Y. Sept. 30, 2014);
Agapito v. Colvin, 12 Civ. 2108 (PAC)(HBP), 2014 WL 774689 at *22
(S.D.N.Y. Feb. 20, 2014) (Crotty, D.J.) (adopting Report &
Recommendation); Norman v. Astrue, 912 F. Supp. 2d 33, 85
(S.D.N.Y. 2012) (Carter, D.J.) (adopting Report & Recommenda-
tion).

## 2.  Substantial Evidence

In addition, because I find legal error that warrants
remand, I do not address whether the ALJ's opinion was supported
by substantial evidence.  "These errors render the record incom-
plete and the Court unable to evaluate the final agency determi-
nation."  Lacava v. Astrue, supra, 2012 WL 6621731 at *11.

## IV.  Conclusion

Accordingly, for all the foregoing reasons, I respect-
fully recommend that plaintiff's motion for judgment on the

pleadings (Docket Item 17) be granted and that the matter be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this report and recommendation. I further recommend that the Commissioner's cross-motion for judgment on the pleadings (Docket Item 22) be denied.

## V.  Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. See also Fed.R.Civ.P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Paul G. Gardephe, United States District Judge, 40 Foley Square, Room 2204, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Gardephe. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW. Thomas v. Arn, 474 U.S. 140, 155 (1985); United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank

v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair
Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714
F.2d 234, 237-38 (2d Cir. 1983) (per curiam).

Dated:  New York, New York
        August 14, 2015

                              Respectfully submitted,


                              HENRY PITMAN
                              United States Magistrate Judge


Copies transmitted to:

Herbert S. Forsmith, Esq.
Herbert S. Forsmith, Attorney at Law
17th Floor
26 Broadway
New York, New York  10004

Joseph A. Pantoja, Esq.
Assistant United States Attorney
Southern District of New York
86 Chambers Street
New York, New York  10007